## AFFIDAVIT OF SPECIAL AGENT ANTHONY J. VENTETUOLO

I, Anthony J. Ventetuolo, having been duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since May 2015, and am presently assigned to the Worcester Satellite Office of the Springfield Field Office.   I am currently assigned to the Springfield Area Firearms Enforcement Task Force.  My responsibilities are to investigate and prevent offenses involving the unlawful use, manufacture, and possession of firearms and explosives.  I attended and successfully completed the Department of Homeland Security Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  In August 2018, I attended and completed ATF Firearms Interstate Nexus Training at the ATF National Center for Explosives Training and Research in Huntsville, Alabama.

2.      I was previously employed by the United States Army Special Operations Command as a Training Instructor in direct support of a Special Operations military unit and completed three overseas deployments in support of the Global War on Terror.  I served as a Police Officer with the City of Virginia Beach, Virginia Police Department from 2002 until 2012.  I earned Bachelor of Science degrees in political science and public administration from James Madison University and earned a Master's degree in criminal justice from Troy University.

3.      While employed as a Police Officer and Special Agent, I have: investigated violations of local, state and federal criminal statutes; made arrests, prepared search and arrest warrant affidavits; interviewed defendants, witnesses and informants; and seized currency, firearms, narcotics and other evidence related to criminal investigations.  I have experience and training in firearms and narcotics trafficking cases, gang investigations and the utilization of

informants and cooperating witnesses to investigate firearms and narcotics trafficking and other organized criminal activity.

4.     I have received training in analysis of call detail and other records from electronic communication facilities commonly used by individuals engaged in criminal activity to communicate about their illegal enterprises.  I have used information obtained from communication facilities, including service provider records and GPS location information, to investigate criminal conspiracies involving firearms and narcotics offenses.  I am familiar with the "street" language used by firearm and/or drug traffickers via electronic communication facilities, as well as the methods they use to disguise conversation and operations.

## PURPOSE OF AFFIDAVIT

5.     I and my law enforcement colleagues have been investigating Vice Lords gang leader Junior MELENDEZ (born 1980), a/k/a "Junito," "Jr," "June," or "J," and other individuals – including other Vice Lords gang members – for the trafficking and distribution of firearms and controlled substances, namely cocaine and crack cocaine, in Massachusetts, New Hampshire and Rhode Island.

6.     This affidavit is submitted in support of an application for a criminal complaint and arrest warrant charging MELENDEZ with (a) conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951, (b) conspiracy to use or carry a firearm during and in relation to a crime of violence for which a person could be prosecuted in a court of the United States, in violation of 18 U.S.C. § 924(o), and (c) conspiracy to possess with intent to distribute and to distribute cocaine and cocaine base, in violation of 21 U.S.C. 846 (the "Subject Offenses").  Based on the facts presented in this affidavit, there is probable cause to believe that MELENDEZ and others both known and unknown have committed the Subject Offenses.

2

7.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit includes only those facts I believe are necessary to establish probable cause for the issuance of the requested complaint and arrest warrant and does not include all of the facts uncovered during the investigation.

## RELEVANT STATUTES

8.      Title 18, United States Code, Section 1951, commonly referred to as the "Hobbs Act" provides that any person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section" shall be punished.  18 U.S.C. § 1951(a).  The statute defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."  18 U.S.C. § 1951(b)(1).

9.      Title 18, United States Code, Section 924(o) provides that "a person who conspires to commit an offense under subsection (c)" shall be punished.  In turn, Title 18, United States Code, Section 924(c) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime … for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be punished.

3

10.     Title 21, United States Code, Section 846 makes it unlawful for any person to conspire with another to possess with the intent to distribute, or to distribute, a controlled substance.  Title 21, United States Code, Section 812 identifies cocaine as a controlled substance.

**PROBABLE CAUSE**

A.     <u>Investigation of Melendez and Associates</u>

11.     Since July 2018, members of the Worcester Police Department ("WPD") and ATF have investigated alleged violations of federal firearms and narcotics laws by MELENDEZ and his associates for the trafficking and distribution of firearms and controlled substances, namely cocaine and crack cocaine, in Massachusetts, New Hampshire and Rhode Island.  The investigation confirmed that MELENDEZ is the leader of the Massachusetts chapter of the Almighty Vice Lords street gang.  WPD detectives are familiar with MELENDEZ through investigations dating as far back as 1997, when MELENDEZ and others became the focus of a drug trafficking investigation conducted by the Drug Enforcement Administration ("DEA"). MELENDEZ was convicted of drug and firearms violations and sentenced to 109 months in prison as a result.

12.     Agents[1] determined that MELENDEZ was using a Sprint cell phone assigned call number (774) 535-1317 (the "MELENDEZ Phone).  On March 13, 2019, the United States District Court authorized the interception of wire and electronic communications involving the MELENDEZ Phone.  <u>See</u> Case No. 19-mc-94009-TSH.  The District Court extended that authorization for additional thirty-day periods on April 12, 2019 and May 10, 2019.

---

[1] Unless otherwise noted, the term "agents" is intended to refer to ATF / DEA special agents, ATF task force officers, Worcester Police detectives and other law enforcement officers participating in this investigation.

4

B.    Facts Establishing Probable Cause for Hobbs Act Conspiracy

13.    In a series of phone calls between March 19, 2019 and March 25, 2019,

MELENDEZ conspired to commit an armed home invasion and robbery with ███████

(born 1991), Keith JOHNSON (born 1981), and Shaun WALKER (born 1977).  During those

calls, it became clear that ███████ was providing MELENDEZ with information regarding the

intended victim, while MELENDEZ tasked JOHNSON and WALKER with making the forced

entry into the residence and committing robbery.  Specifically:

(a)    On March 19, 2019, at approximately 5:33 pm, JOHNSON called

MELENDEZ and asked to meet in order to "speak about that."  MELENDEZ responded

that [an unknown male] was "OT" and that MELENDEZ was "waiting for him to come

from out there so he could get all the details broke down."  MELENDEZ said it was

100% sure but that [the unknown male] "was not coming back for another 4."

MELENDEZ assured JOHNSON that "we will know everything."  Based on my training

and experience, as well as the investigation to date, I believe MELENDEZ was informing

JOHNSON that he fully intended to commit the robbery (i.e. "it was 100% sure") but that

he was still in the process of obtaining information regarding the intended target, and that

his source of information was presently out of town (i.e. "OT").

(b)    During that same call, MELENDEZ informed JOHNSON that JOHNSON

would be accompanied by Shaun WALKER a/k/ "Shiz."  JOHNSON expressed a desire

to bring a larger male with him, "for more body… just in fact they inside."  MELENDEZ

assured JOHNSON that "we will figure it out."  JOHNSON responded "I'm going in

first, it doesn't even matter." Based on my training and experience, as well as the

investigation to date, I believe JOHNSON wanted a physically imposing person with him

in the event that the residence was occupied.

      (c)    On March 21, 2019, at approximately 12:50 pm, ████████ called

MELENDEZ and informed MELENDEZ that "yeah, you can do that shit Sunday if

anything." ████████ asked, "is it a go?"  MELENDEZ responded "yea, they all lined

up."  Based on my training and experience, as well as the investigation to date, I believe

MELENDEZ was confirming with ████████ that they would were prepared to commit

the robbery on Sunday.

      (d)    On March 23, 2019, at approximately 9:41 pm, MELENDEZ called

JOHNSON and advised him, "tomorrow."  MELENDEZ informed JOHNSON that

another male "was out there right now getting the whole layout," and that the intended

victim's home is in "like a rich, rich ass neighborhood."  JOHNSON asked "who's in the

crib?"  MELENDEZ stated that the other male was going to let him know everything

today.  Based on my training and experience, as well as the investigation to date, I

believe MELENDEZ was awaiting word on who would be present in the the target

residence.

      (e)    On March 24, 2019, at approximately 7:12 pm, MELENDEZ called

JOHNSON and informed him "tonight around 2 or 3 in the morning."  JOHNSON

confirmed that he would be ready and asked if MELENDEZ "was good."  MELENDEZ

said that he would "scoop" JOHNSON sooner so they could "get detailed out."  Based on

my training and experience, as well as the investigation to date, I believe that

MELENDEZ was planning to pick JOHNSON up so that they could further plan the

intended robbery.

      (f)    On March 25, 2019, at approximately 1:42 am, MELENDEZ called

████████ and asked "what was going on?" ████████ responded that he was ready "whenever the guys were ready." MELENDEZ complained that he had been waiting "the whole f---ing night." ████████ and MELENDEZ agreed to meet "by the barber shop."

(g)    On March 25, 2019, at approximately 2:04 am, MELENDEZ again called ████████ and further discussed "scoping" it out. MELENDEZ informed ████████ that they would "do it tomorrow," because MELENDEZ wanted to "make sure and get away with it," and that 2 or 3 in the morning was "not really the best time to do it." Instead, MELENDEZ made plans to meet ████████ at a location in Worcester.

(h)    On March 25, 2019, at approximately 12:34 pm, MELENDEZ called JOHNSON and asked if JOHNSON was ready. MELENDEZ instructed JOHNSON to call him when he was ready, and stated that he (MELENDEZ) would pick JOHNSON up and then go pick up WALKER.

(i)    On March 25, 2019, at approximately 1:08 pm, JOHNSON called MELENDEZ and asked if "you got the thing, or I bringing mine?" MELENDEZ said he is finding out right now, but "he might not, he probably not even be there." MELENDEZ told JOHNSON to "bring yours just in case," then said, "just bring one, bring one." JOHNSON acknowledged. Based on my training and experience, as well as the investigation to date, I believe that JOHNSON was asking MELENDEZ if he should bring a firearm, and MELENDEZ responded in the affirmative "just in case." Further, I believe that when MELENDEZ stated that "he probably not even be there," he was referring to the likelihood of the occupants of the residence being present at the time of the forced entry.

(j)     On March 25, 2019, at approximately 2:48 pm, MELENDEZ called

WALKER and told WALKER to "go in Home Depot" while he and a third party [likely

█████████] went to "see if the whip and shit is there."[2]  MELENDEZ told WALKER to

get "whatever we need," and that MELENDEZ would be right back because he was

"only three minutes from his house."  Based on my training and experience, as well as the

investigation to date, I believe that MELENDEZ was informing WALKER that he and

███████ were going to the target residence and instructing WALKER to purchase the

tools necessary to forcefully enter the target residence.

(k)     On March 25, 2019, at approximately 3:02 pm, MELENDEZ called

WALKER and asked about WALKER's location. WALKER replied that he was "in the

parking lot" and asked MELENDEZ to "come buy this" because "we can't be showing

our face."  MELENDEZ informed WALKER that he was already inside.  WALKER told

MELENDEZ to "grab a crowbar or whatever you think will work;" MELENDEZ agreed.

MELENDEZ said there was a "whip" in the driveway, and that "we don't think anybody

is there anyway, but we're not sure."  MELENDEZ said that he was attempting to obtain

more information.

14.     Based upon those communications, as well as observations made through physical

surveillance, agents believed that an armed home invasion and robbery was imminent and

intervened to disrupt that activity.  Massachusetts State Police stopped the two vehicles involved

in the Home Depot parking lot in Rockland, Massachusetts.

15.     WALKER was operating a Honda CRV registered to ███████'s sister.

---

[2] Based upon my training and experience, and the investigation to date, I know that the term "whip" refers
to an automobile.

8

JOHNSON was the front seat passenger in the vehicle.  Police seized a loaded .380 caliber firearm from the glove compartment of the CRV.  Officers also located a 24" pry-bar that MELENDEZ purchased from Home Depot at 3:07 pm on March 25, 2019, and a four-wheeled handcart or dolly within the vehicle.

16.    MELENDEZ and ████████ occupied a black Dodge Charger bearing Maryland registration 7CX8327, that agents had identified during the investigation as used by MELENDEZ.  Officers located and photographed a ski mask in the vehicle.  Also within the vehicle were two cardboard boxes containing glass marijuana smoking pipes.

17.    Based upon location information obtained for cell phones used by MELENDEZ and JOHNSON, investigators determined that the intended target was located in the area of French Road and Old Country Way in Rockland.

18.    The following day, March 26, 2019, agents canvassed the neighborhoods of French Road and Old Country Way.  An agent met with Witness #1, who had been present at her residence on French Road the previous afternoon.  Witness, #1 informed agents that on March 25, 2019, at approximately 2:53 pm, a skinny black male removed two cardboard boxes from the front doorstep of her residence.  Agents subsequently viewed the security video; the male depicted on the video is consistent in appearance with ████████.  Another female, who was arriving at the French Road residence to visit Witness #1, observed a tall, skinny black male carrying the two boxes away from the property and enter a black sedan parked around the corner from the residence.[3]  Witness #1 stated that she lived at the single family French Road residence with her boyfriend, Witness #2, but that he was away on a snowboarding trip on March 25, 2019.

---

[3] The Massachusetts Board of Probation record for ████████ lists him as 5'10" tall and weighing 145 pounds.

19.     On March 28, 2019, investigators spoke to Witness #2.  Witness #2 informed officers that he is engaged in the sale of "high end" custom glass art.  Witness #2 stated that he is a collector and dealer of glass marijuana smoking devices that he advertises for sale on social media, including Facebook and Instagram.  Witness #2 told agents that he sells the glass smoking devices to people throughout the country, including to a customer from Colorado just a few weeks prior.

20.     According to Witness #2, he and his business partner do not have commercial space; therefore, potential customers have visited the French Road residence to view Witness #2's glass smoking device collection.  Witness #2 estimated that the inventory that he had at the French Road on March 25, 2019 was valued at approximately $40,000.

21.     Based on the above referenced intercepted communications, the physical surveillance, the security video from the French Road residence, ██████'s apparent visit and theft of property from the doorstep of the French Road residence, the presence of a loaded firearm, crowbar, handcart, and ski mask within the vehicles, and the interviews of the residents of the French Road residence, there is probable cause to believe that MELENDEZ, ██████, JOHNSON and WALKER conspired to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951.  Moreover, there is probable cause to believe that MELENDEZ and JOHNSON conspired to use or carry a firearm during and in relation to a crime of violence for which a person could be prosecuted in a court of the United States, in violation of 18 U.S.C. § 924(o).

C.  Facts Establishing Probable Cause for Drug Conspiracy

22.     The investigation further revealed that MELENDEZ has conspired with several individuals – including Juan E. RODRIGUEZ a/k/a "Mula" (born 1990), Antoine MACK (born 1982), ██████████, Angel CORDOVA a/k/a "Cano" (born 1984) and ██████

███████████████████ – to possess with intent to distribute and to distribute

powder cocaine and cocaine base.  Specifically, the investigation has revealed that MELENDEZ

and RODRIGUEZ conspired to (a) acquire significant quantities of powder cocaine, including

the acquisition of cocaine from CORDOVA, (b) convert a portion of that powder cocaine into

crack cocaine, and (c) store and distribute powder and crack cocaine from 69 Cutler Street and

other locations to various individuals, including ███████.  MELENDEZ and RODRIGUEZ

have utilized MACK and █████ to assist in the acquisition and distribution of the cocaine.

Evidence of this conspiracy includes the following interceptions and activity.

23.      On March 14, 2019, at approximately 2:47 pm, MELENDEZ placed a call to

RODRIGUEZ.  After discussing some work that RODRIGUEZ was doing on one property,

RODRIGUEZ informed MELENDEZ that "I got almost the whole thing too, bro."  MELENDEZ

asked "They gave you almost the whole thing?" RODRIGUEZ answered "Yeah."  MELENDEZ

responded, "Okay, good. █████ will be through tomorrow and, yea, everything will be..."

RODRIGUEZ then told MELENDEZ that "I'm tryin get this shit quick [U/I]."  MELENDEZ

then stated "Imma call you on a different one."  Based on my training and experience and the

investigation to date, I believe that RODRIGUEZ was telling him that he had gotten a significant

quantity of cocaine ("I got almost the whole thing"), and that MELENDEZ was pleased because

████████████████ would be in Worcester the following day to purchase cocaine.[4]

---

[4]  I believe that MELENDEZ and RODRIGUEZ were discussing cocaine because information developed
during the investigation indicated that MELENDEZ was engaged in the distribution of cocaine, two
individuals (███████████████████████) stopped by investigators after separately meeting
with MELENDEZ in April 2019 were found to be in possession of crack cocaine and charged in state
court with possession with intent to distribute cocaine cocaine, and, as described below, the quantity and
description of the substance that MELENDEZ purchased from CORDOVA on May 17, 2019 ("531 in
one piece"), and the fact that RICHARDS a/k/a "Lito" was stopped by law enforcement on May 25, 2019
after meeting with MELENDEZ and was found to be in possession of approximately 200 grams of
powder cocaine and approximately 115 grams of cocaine base.

RODRIGUEZ's statement that he was "tryin get this shit quick" likely was a reference to his intent either to convert the powder cocaine into crack cocaine, or to earn money quickly by immediately distributing the cocaine.  At that point, MELENDEZ indicated that he would call RODRIGUEZ from a different phone.

24.     On March 24, 2019, at approximately 7:40 pm, RODRIGUEZ called MELENDEZ.  During the ensuing conversation, MELENDEZ asked RODRIGUEZ "did you do any up?"  RODRIGUEZ responded, "Nah, I haven't even touch it.  I'm about to head out now."  MELENDEZ asked "can you do one up?"  RODRIGUEZ responded "Yup."  Approximately one hour later, at about 8:45 pm, RODRIGUEZ called MELENDEZ on the MELENDEZ Phone.  During that intercepted call, RODRIGUEZ informed MELENDEZ that the "shit was still damp," and that this "batch was better than the last."  Based on my training and experience, as well as this investigation to date, I believe MELENDEZ and RODRIGUEZ were discussing the cooking of powder cocaine into crack cocaine, and the required drying involved in that process.

    April 2, 2019 Arrest of Lujan BURGOS

25.     On April 2, 2019, agents monitoring a pole camera mounted in the area of MELENDEZ's residence at 26 Malvern Road observed Lujan BURGOS (born 1992) (a/k/a "Slim," a/k/a "Jordan") and MELENDEZ meet outside the residence and then enter the residence together.  Worcester police stopped BURGOS after he left 26 Malvern Road for operating with a suspended license.  During that stop, Worcester police found BURGOS in possession of approximately 23 grams of suspected crack cocaine.

26.     The following day, April 3, 2019, at approximately 2:27 pm, RODRIGUEZ called MELENDEZ.  During that call, the following exchange ensued:

RODRIGUEZ:     I'm hollering for some other shit, this nigga Jordan (BURGOS) got bagged, I got, I got seven right now but his is ten, wanted to see if you want to throw the last couple?

MELENDEZ:      Let me uh... well, you already know, I just did everything with everything right there. So got to allow me to make some moves.

RODRIGUEZ:     I know I'm hip I can't I'm not even if he wasn't one of my closest dudes I wouldn't even do it, cause you already knows you trying to invest into that other thing.

MELENDEZ:      We'll do it tomorrow, we'll get him out tomorrow.

Based on my training and experience, and the investigation to date, I believe that RODRIGUEZ was informing MELENDEZ that BURGOS had been arrested and bail was set at $10,000. RODRIGUEZ informed MELENDEZ that he had $7,000 but needed an additional $3,000 from MELENDEZ in order to post BURGOS' bail.  MELENDEZ informed RODRIGUEZ that he did not have the $3,000 but would obtain those funds after he was able to make additional drug sales (i.e. "got to allow me to make some moves").

April 3, 2019 Distribution by MELENDEZ and MACK to █████████

27.     On April 3, 2019, at approximately 1:03 pm, MACK called MELENDEZ.  During that call, MELENDEZ asked MACK if he wanted to earn money by doing a "█████████

█████████ ) thing." MACK agreed.  MELENDEZ asked MACK "How long are you gonna be so I just, so I just see if he'll [█████████, if he'll still be around."  MACK inquired, "I mean, where am I going to where I usually go?"  When MELENDEZ responded yes, MACK stated that he could "be in the winds in an hour, tops."   MELENDEZ then confirmed that MACK could be "out here before 3, to him [█████████] about 4?"  MACK affirmed.

28.     Based on that call, as well several text messages exchanged between MELENDEZ and MACK, agents conducted surveillance at RODRIGUEZ's residence at 69 Cutler Street, a location MELENDEZ frequently used for drug activity.  At approximately 3:25

pm, a surveillance officer observed the black Mercedes sedan used by MELENDEZ parked in the driveway at 69 Cutler Street.  At approximately 3:31 pm, a surveillance officer observed the blue Hyundai Tucson used by MACK arrive at 69 Cutler Street.  A male exited the Hyundai and entered 69 Cutler Street.  Approximately 20 minutes later, the same male exited 69 Cutler Street, re-entered the Hyundai, and drove from the area.  Agents followed the vehicle as it drove to New Hampshire.



29.     Agents conducting surveillance at ▮▮▮▮▮' residence at ▮▮▮▮▮▮▮▮ ▮▮▮▮, Manchester, New Hampshire, later observed the blue Hyundai parked in the driveway. At approximately 5:07 pm, MELENDEZ called MACK and advised MACK that "he" (presumably ▮▮▮▮▮) was at the grocery store and would be there in 10 minutes.  MACK expressed concern about waiting in the driveway.  MELENDEZ told MACK to leave "that" in the "whip" (i.e. car) and take a walk.  At approximately 5:22 pm, MACK called MELENDEZ and asked "what's the word?"  MELENDEZ told MACK that "he should be there," and indicated that he would call ▮▮▮▮▮ from his "other number."  While still on the phone with MACK, MELENDEZ could be heard using a different phone to call and speak with ▮▮▮▮▮.

30.     At approximately 5:24 pm, surveillance officers observed a male believed to be ▮▮▮▮▮ driving a BMW SUV registered to ▮▮▮▮▮ arrive at ▮▮▮▮▮▮▮. MACK and ▮▮▮▮▮ met outside the building and then entered the residence.  Several minutes later, MACK exited the residence carrying a plastic shopping bag and left the area in the Hyundai.  Agents monitoring a pole mounted camera in the area of 26 Malvern Road observed the Hyundai arrive at 26 Malvern Road at approximately 7:53 pm.  MACK, carrying a bag and accompanied by a female, exited the Hyundai and entered 26 Malvern Road.  In my training and experience, and based on the investigation to date, I believe that MACK delivered cocaine to

14

██████████ at ████████████████ and returned to 26 Malvern Road to deliver the cash proceeds to MELENDEZ.[5]

     April 22, 2019 Distribution of Cocaine by MELENDEZ and MACK to ████████

28.     On April 22, 2019, at approximately 11:39 am, MELENDEZ called MACK and informed MACK that ████████████████ was expecting MELENDEZ to send someone. Later, at approximately 12:29 pm, MACK sent a text message to MELENDEZ that read "location."  At approximately 12:48 pm, MACK called MELENDEZ, during which MELENDEZ directed MACK to "Mula's [RODRIGUEZ's] spot."

29.     Based on those communications, agents surveilled the area of RODRIGUEZ's residence at 69 Cutler Street.  At approximately 1:02 pm, a surveillance officer observed the black Jaguar FPace SUV used by MELENDEZ parked in front of 69 Cutler Street.[6]  At approximately 1:13 pm, the surveillance officer observed a Nissan Rogue in the driveway at 69 Cutler Street.

30.     At approximately 1:27 pm, a surveillance officer observed the Nissan Rogue depart Cutler Street.  An agent identified MACK as the operator of the vehicle when it was in the vicinity of Cumberland Farms on Grafton Street in Worcester.

31.     MACK proceeded onto Interstate 495 North.  At agents' direction, Massachusetts

---

[5] Notably, and likely relevant to RODRIGUEZ's request earlier in the day for money to post bail for BURGOS, MELENDEZ called RODRIGUEZ at approximately 8:03 pm and stated "I told, I told you what I had, well I got more than that now though. I didn't count, I just got to tell them."  Based on my training and experience, and the investigation to date, I believe that MELENDEZ was informing RODRIGUEZ that he now had the additional funds that RODRIGUEZ had requested, further evidence that MACK delivered cash proceeds to MELENDEZ minutes before at 26 Malvern Road.

[6] MELENDEZ rented and began using the Jaguar SUV after his Mercedes C-300 sedan was involved in a one car collision on or about April 16, 2019.

State Police stopped MACK's vehicle. The troopers determined that MACK was not an authorized operator of the Rogue per the rental agreement; they removed MACK from the vehicle and, due to the heavy rain, placed him in rear of the state police cruiser. Troopers inventoried the Nissan Rogue with negative results and had it towed to the barracks. They then drove MACK to a local convenience store so that he could call for a ride.

32.     Notably, that same day, MACK used his phone to post a video to his SnapChat account. That video shows MACK, apparently seated in the police cruiser, laughing and smiling behind a text banner on the screen that read "STUPID ASS POLICE IF ONLY THEY KNEW LMAO."[7]

33.     Later that night, at approximately 9:49 pm, MACK called MELENDEZ and advised MELENDEZ that "█████████ didn't answer." MELENDEZ instructed MACK to "knock on ████ door" and that he [MELENDEZ] would call ████████. At approximately 9:54 pm, MELENDEZ called █████████ and told █████████ that "Leg [MACK] is already there." █████████ told MELENDEZ that he needed five minutes because he just got out of the shower.

34.     At approximately 9:57 pm, a surveillance officer observed a tan Nissan Altima (the "Altima") registered to Juan RODRIGUEZ at 69 Cutler Street, Worcester – parked in front of █████████ residence at █████████████ Manchester, New Hampshire. A surveillance officer subsequently observed MACK operating the Altima as it departed the area of ████████████████ at approximately 10:10 pm.

35.     Later that night, at approximately 11:15 pm, surveillance officers observed the

---

[7] "LMOA" is an abbreviation commonly used on social media for "Laughing My Ass Off."

Altima arrive in the area of 69 Cutler Street.  A male, carrying a bag, exited the driver's side of the vehicle and approached 69 Cutler Street.  At that same time, MACK called MELENDEZ and told MELENDEZ that he was at "the crib."  MACK confirmed when MELENDEZ asked, "Mula's [RODRIGUEZ's]?"  MELENDEZ then directed MACK to meet him at Melendez's sister's residence.  In response to MACK's request for the address, at 11:17 pm, MELENDEZ texted "531 main st" to MACK.  At approximately 11:29 pm, a surveillance officer observed MACK park the Altima across from 531 Main Street in Worcester and exit the vehicle carrying a gray bag.

36.     Based upon the intercepted communications and the physical surveillance conducted, I believe that MELENDEZ coordinated a delivery of cocaine by MACK to ██████████ on April 22, 2019.  I believe that MSP initially interrupted the delivery when it stopped the vehicle that MACK was operating that afternoon; however, it appears that MACK was able to conceal the narcotics on his person and avoid detection by the police.  Agents believe that MACK successfully delivered the cocaine to ██████████ later that evening and returned to 531 Main Street to deliver the proceeds of the cocaine sale to MELENDEZ.

May 1, 2019 Distribution by MELENDEZ and RODRIGUEZ to the Brother of D.B.[8]

37.     On May 1, 2019 at approximately 8:08 pm, RODRIGUEZ placed a phone call to MELENDEZ.  During the ensuing conversation, MELENDEZ informed RODRIGUEZ that MELENDEZ forgot he had arranged for "[D.B.'s] brother" to go "over there."  MELENDEZ asked RODRIGUEZ if he could "take care of it."  RODRIGUEZ agreed and asked MELENDEZ if that "thing" was "in the spot," to which MELENDEZ replied, "Jordan [i.e. BURGOS] knows

---

[8] D.B. is known to Worcester police as a Vice Lords member.

where it is."  RODRIGUEZ advised MELENDEZ to "say less" and MELENDEZ instructed

RODRIGUEZ, "Hey, throw him [D.B.'s brother] forty-six if you could.  If you could.  Throw

him forty-six."  RODRIGUEZ agreed.

38.     The call described above occurred approximately twenty minutes after a call

between MELENDEZ and a male with the initials L.B., who is a brother of the male known as

D.B.  During that brief call, MELENDEZ informed L.B. that "I will hit you right back on the

other one."

39.     Based on training and experience, as well as this investigation to date, I believe

that MELENDEZ had agreed to provide narcotics to L.B. and the men discussed that

arrangement in further detail using a different phone to which MELENDEZ had access.  Further,

I believe that MELENDEZ was directing RODRIGUEZ to distribute narcotics to L.B. on

MELENDEZ's behalf.

        <u>May 6, 2019 Distribution by CORDOVA to MELENDEZ and</u> █████

40.     During the investigation, agents identified Angel CORDOVA a/k/a "Cano" as a

primary source of cocaine for MELENDEZ.

41.     On May 6, 2019, at approximately 4:54 pm, CORDOVA called MELENDEZ.

During the ensuing conversation MELENDEZ told CORDOVA "Give me uh..uh… bring five."

CORDOVA asked, "How much?"  MELENDEZ responded "Five."  Based on my training and

experience, and the investigation to date, I believe MELENDEZ was coordinating the acquisition

of 500 grams of cocaine from CORDOVA.

42.     On May 6, 2019, at approximately 8:09 pm, CORDOVA called MELENDEZ and

stated, "I'm ready."  MELENDEZ replied "I'm gonna send - where you came last time,

remember?  Where you and him came, same place."  CORDOVA affirmed and MELENDEZ said, "Six.  Six."  CORDOVA replied, "No, five I got."

43.      On the same date, at approximately 8:25 pm, CORDOVA again called MELENDEZ.  MELENDEZ explained to CORDOVA that he [MELENDEZ] had to go to the mall, so would not be available to meet.  MELENDEZ told CORDOVA, "I'm gonna have my man…he'll run down to you," then again asked, "what number?"  CORDOVA replied, "Five."

44.      At approximately 8:36 pm, CORDOVA called MELENDEZ.  MELENDEZ asked "what are you driving in?  I'm having him come down."  CORDOVA informed MELENDEZ that he was in a gray Charger.  MELENDEZ then told CORDOVA, "Alright, I'll have him come down.  It's a white kid."

45.      A minute later, at approximately 8:37 pm, MELENDEZ called ███ and told ███, "Gray Charger, he is out there." ███ asked "He is in a gray Charger?  He is out there now?  Is he on Cutler?"  MELENDEZ responded, "Yeah, uh-huh."

46.      At approximately 8:41 pm, a surveillance officer observed a grey Dodge Charger bearing MA registration 9ZB613 arrive at 69 Cutler Street and park.  The surveillance officer observed ███████, a white male, exit 69 Cutler Street, approach the Dodge Charger for a brief period, and return to 69 Cutler Street.  Less than 3 minutes after it arrived on Cutler Street, the Dodge Charger left the area.  Based on my training and experience, as well as intercepted communications, I believe that CORDOVA delivered 500 grams of cocaine to ███ and MELENDEZ at 69 Cutler Street on May 6, 2019.

<u>May 8, 2019 Distribution of Cocaine by MELENDEZ and ███ to ███████</u>

47.      The following day, May 7, 2019 at approximately 5:23 pm, MELENDEZ called ███████ and informed him that he "had someone who was going to be driving past there but

they left."  replied, "I ain't ready yet."  MELENDEZ said, "there's four there for

you so the sooner the better."  ███████████ explained he was "waiting til I was thin."

███████████ told MELENDEZ that he would "be there tomorrow definitely" and said that he

would see MELENDEZ "tomorrow."  Based on my training and experience, and the

investigation to date, I believe that MELENDEZ was arranging to distribute 400 grams of

cocaine ("there's four there for you") to ███████, while ███████ explained that he still

had some inventory on hand ("waiting til I was thin").  The men agreed to engage in the drug

sale the following day.

     48.     On May 8, 2019, at approximately 12:02 pm, MELENDEZ called ███████████

and informed ███████ that MELENDEZ would "head out there soon."  ███████████

responded "Alright."

     49.     At approximately 2:23 pm, an officer conducting surveillance in the area of 69

Cutler Street observed the Altima registered to Juan RODRIGUEZ – and previously used by

MACK on April 22, 2019 – leave the driveway of 69 Cutler Street.  At approximately 2:25 pm

on the same date, an officer monitoring the IP camera installed on ███████ Street observed the

Altima arrive at ███████████ Street, the location of ███████ residence, as well as a barber shop

operated by █████.  A male exited the driver's side and entered ███████████ Street.  At

approximately 2:28 pm, the officer monitoring the IP camera observed the same male exit ███

███████ Street carrying a black bag, re-enter the Altima, and drive from the area.

     50.     According to information obtained pursuant to a court authorized pen register and

trap-and-trace device installed on the phone used by ███████████, on May 8, 2019, at

approximately 4 pm, █████████ phone received an incoming voice call from the cell phone
used by ██████[9]

51.     At approximately 4:40 pm, MELENDEZ called █████.  MELENDEZ stated that
he was "just making sure everything was good." █████ responded that he had "a little bit of a
scary moment for four exits."  MELENDEZ acknowledged and told █████ he would see him
upon his return to Worcester.  At approximately 5:17 pm, MELENDEZ again called █████ who
informed MELENDEZ he was "just getting back into Worcester now."  MELENDEZ explained
that an unidentified male (possibly RODRIGUEZ) needed a baseball bag that was in the car that
█████ was driving.

52.     Based on the content of the communications referenced above, as well as this
investigation to date, I believe that █████ used RODRIGUEZ's vehicle to deliver cocaine –
likely 400 grams – to █████████ in Manchester, New Hampshire.  █████ statement that
things "got a little scary for four exits" suggest that something, perhaps the presence of
uninvolved law enforcement, had caused █████ some anxiety, an indication that █████ knew he
was involved in criminal activity.

     <u>May 17, 2019 Distribution of Cocaine by CORDOVA to MELENDEZ</u>

53.     On May 16, 2019, at approximately 1:03 pm, CORDOVA called MELENDEZ
and asked if MELENDEZ was "going to need it or no." MELENDEZ told CORDOVA that he
did "need it," but that it would be a couple of hours because MELENDEZ was going to
Providence.  MELENDEZ again told CORDOVA he did "need him."  CORDOVA affirmed and
told MELENDEZ to call him back.

---

[9] The distance between █████████, Worcester, Massachusetts (█████ residence) and █████████
█████████, Manchester, New Hampshire (█████████' residence) is approximately 73 miles.

54.     That same day, at approximately 4:46 pm, CORDOVA called MELENDEZ and said that he would "link" with CORDOVA around 6:30 after he picked up his son from school. MELENDEZ further stated "five, or more maybe, probably more but five minimum."  Based on my training and experience, and the investigation to date, I believe that MELENDEZ and CORDOVA were coordinating CORDOVA's delivery of cocaine to MELENDEZ, with MELENDEZ informing CORDOVA that he needed at least 500 grams of cocaine.

55.     On May 17, 2019, at approximately 1:56 pm, CORDOVA again called MELENDEZ and asked if MELENDEZ was "ready."  CORDOVA informed MELENDEZ that he had "531 in one piece" and did not want to "break it."  MELNDEZ agreed to "take it all."

56.     On May 17, at approximately 4:23 pm, CORDOVA called MELENDEZ to inform MELENDEZ he was "there."  MELENDEZ said that he would be there in five minutes, and directed CORDOVA to go in front of "26."

57.     Minutes later, at approximately 4:27 pm, agents monitoring the pole camera in the area of 26 Malvern Road observed a black Mazda CX9 SUV registered to CORDOVA driving back and forth on Malvern Road.  At approximately 4:36 pm, the Mazda and the black Jaguar SUV driven by MELENDEZ parked in front of 26 Malvern Road.  Agents observed MELENDEZ and a white male, believed to be an individual known to agents, exit the Jaguar and meet with CORDOVA.  The three men entered the front door of 26 Malvern Road.  Several minutes later, CORDOVA exited the front door of 26 Malvern Road, entered the Mazda CX9 and left the area.

58.     Based on my training and experience, as well as the investigation to date, I believe MELENDEZ and CORDOVA met at 26 Malvern Road on May 17, 2019 to conduct a narcotics transaction.  The calls between MELENDEZ and CORDOVA prior to the meeting

regarding CORDOVA having "531" and not wanting to "break it" suggest CORDOVA had 531 grams of cocaine and wanted MELENDEZ to purchase the entire amount.  MELENDEZ directed CORDOVA to "26," or 26 Malvern Road, where agents observed CORDOVA and MELENDEZ enter the residence together.  CORDOVA left a short time later, consistent with a drug deal.

       May 25, 2019 Distribution of Cocaine from CORDOVA to MELENDEZ to ▮▮▮▮▮▮▮▮▮

59.      On May 24, 2019, at approximately 6:05 pm, CORDOVA called MELENDEZ. During that call MELENDEZ asked CORDOVA if it was the "same" or "different;" CORDOVA replied that it was a little "different."  MELENDEZ told CORDOVA, "two and a half" and then "three."  MELENDEZ and CORDOVA agreed to speak later.  At approximately 7:16 pm, CORDOVA again called MELENDEZ, at which time the men agreed to meet the next morning

60.      On May 25, 2019 at approximately 2:00 pm, CORDOVA called MELENDEZ during which the men agreed to meet and CORDOVA confirmed "three right?"  MELENDEZ acknowledged.  At approximately 2:24 pm, CORDOVA called MELENDEZ and asked where they should meet.  MELENDEZ stated he would text CORDOVA the address.  At approximately 2:25 pm, MELENDEZ sent a text to CORDOVA that read "151 Hartford turnpike Shrewsbury." Based on the content of these calls, as well as this investigation to date, I believe that MELENDEZ and CORDOVA agreed to meet at MELENDEZ's trailer home located at 151 Hartford Turnpike, Lot #4, in Shrewsbury to engage in a drug deal.  MELENDEZ and CORDOVA discussed "two and a half" and "three," which, based upon my training and experience, as well as this investigation to date, I believe referred to 250 to 300 grams of cocaine.

61.      Agents conducted surveillance in the area of 151 Hartford Turnpike in Shrewsbury.  At approximately 2:51 pm, a surveillance officer observed the black Mazda CX9

SUV registered to CORDOVA traveling on Hartford Turnpike in Shrewsbury in the direction of 151 Hartford Turnpike. Approximately one minute later, an agent monitoring an Internet Protocol (IP) camera installed in the area of 151 Hartford Turnpike observed the Mazda arrive and park at 151 Hartford Turnpike. CORDOVA exited the Mazda with a black bag slung over his right arm and entered the trailer at Lot #4.[10]

62.     Minutes later, at approximately 3:10 pm, the agent monitoring the IP camera observed CORDOVA exit the trailer at Lot #4, retrieve something from the front seat of the Mazda CX9 and re-enter the trailer.

63.     At approximately 3:19 pm, while CORDOVA and MELENDEZ were meeting in the trailer, MELENDEZ made a brief outgoing call to RODRIGUEZ during which the following conversation ensued:

| | |
|---|---|
| RODRIGUEZ: | Yeah. |
| MELENDEZ: | Do you, do you know what I'm saying? |
| RODRIGUEZ: | Yeah, I know what you are saying. |
| MELENDEZ: | [U/I] [Voices overlap] |
| RODRIGUEZ: | I wanted to holla at you about something else. |
| MELENDEZ: | Alright but I'm meeting up with him now, that's what I'm saying. |
| RODRIGUEZ: | Alright. |
| MELENDEZ: | Do you want it or no? |
| RODRIGUEZ: | Huh? |
| MELENDEZ: | Do you want it or no? |

---

[10] These observations were contemporaneous with two calls between MELENDEZ and CORDOVA during which MELENDEZ directed CORDOVA where to park.

While CORDOVA was inside the trailer home, at approximately 3:08 pm, MELENDEZ received a call on the MELENDEZ Phone that was placed from the phone service of a correctional facility. While MELENDEZ was entering information to establish a phone account with that facility, MELENDEZ could be heard apparently speaking to someone in the trailer, and said "that's 20 grams."

RODRIGUEZ:      I said yeah.

MELENDEZ:       Okay but what, that's what I'm saying an estimate.

RODRIGUEZ:      Eh just do what you wrote.

MELENDEZ:       Alright. Alright.

Based on my training and experience, and the investigation to date, I believe that MELENDEZ and RODRIGUEZ had previously discussed obtaining controlled substances from CORDOVA, and MELENDEZ was confirming in his call that he was presently meeting with CORDOVA and that RODRIGUEZ wanted to acquire the substances.[11]

64.     At approximately 3:20 pm, while CORDOVA and MELENDEZ were meeting in the trailer, ███████ called MELENDEZ and informed MELENDEZ that he was "like forty minutes away." ███████ asked MELENDEZ "Where you at? Where I saw you last time?" MELENDEZ replied "the trailer."  Based on the content of these calls, as well as this investigation to date, I believe MELENDEZ was directing ███████ to 151 Hartford Turnpike, Shrewsbury so that MELENDEZ could deliver cocaine to ███████

65.     At approximately 3:47 pm, CORDOVA exited the trailer at Lot #4 and left the area of 151 Hartford Turnpike in the Mazda CX9.  Surveillance units followed CORDOVA as he returned to his residence at 29 Laurel Street in Worcester.

66.     At approximately 3:55 pm, the agent monitoring the IP camera observed MELENDEZ exit Lot #4 and depart 151 Hartford Turnpike in the black Jaguar F-Pace SUV.  At approximately 4:17 pm, the agent observed a black Honda Civic bearing New Hampshire

---

[11] RODRIGUEZ indicated that MELENDEZ should "just do what you wrote."  Agents did not intercept any prior relevant text message between RODRIGUEZ and MELENDEZ.  It is possible that MELENDEZ either used a different phone or that he communicated using an iMessage (rather than an SMS text message), which agents are not able to intercept.

registration arrive at 151 Hartford Turnpike.[12]  The agent observed a male, consistent in appearance with ████████, exit the Honda carrying a white plastic bag.  At approximately 4:20 pm, the agent observed MELENDEZ return to 151 Hartford Turnpike in the black Jaguar SUV.  MELENDEZ and ████████ entered the trailer at Lot #4 together.

67.     At approximately 4:30 pm, the agent observed MELENDEZ exit the trailer and retrieve a manila-colored envelope from the rear of the Jaguar.  MELENDEZ then re-entered the trailer.

68.     Eight minutes later, at approximately 4:38 pm, ████████ exited the trailer at Lot #4 carrying a white plastic bag, which he placed in the trunk of the Honda Civic. ████████ then entered the Honda Civic and drove from the area of 151 Hartford Turnpike as investigators followed.

69.     At approximately 5:33 pm, New Hampshire State Police stopped the Honda on Route 3 in New Hampshire.  Troopers identified ████████ as the operator and sole occupant. RICHARDS admitted to troopers that he had cocaine in the vehicle.  The troopers subsequently located and seized, amongst other things, approximately 200 grams of suspected powder cocaine and approximately 115 grams of suspected crack cocaine.[13]

70.     Based on the intercepted communications, physical surveillance, monitoring of the IP camera and the seizure of suspected cocaine and cocaine base from RICHARDS, I believe that CORDOVA distributed cocaine to MELENDEZ at 151 Hartford Turnpike on May 25, 2019,

---

[12] The Honda is registered to a female (born 1981) with an address of ████████ Manchester, New Hampshire.  ████████ address of record is also ████████ Manchester, New Hampshire.

[13] The troopers secured the suspected cocaine as evidence at a State Police barracks.

and that MELENDEZ subsequently distributed cocaine and cocaine base to ████████ later
that same afternoon.

> <u>Further Evidence of the Concerted Efforts by MELENDEZ and RODRIGUEZ to Store
> and Distribute Controlled Substances from 69 Cutler Street</u>

71.     On May 16, 2019, Southbridge police arrested RODRIGUEZ for misdemeanor
offenses related to a dispute that occurred in a Southbridge bar.[14]  Although RODRIGUEZ was
released from custody after this arrest, on or about May 20, 2019, Worcester Superior Court
issued a warrant for RODRIGUEZ's arrest for the violation of RODRIGUEZ's conditions of
pre-trial release on open charges in Worcester Superior Court.

72.     On May 20, 2019 at approximately 6:07 pm, MELENDEZ called a close family
member of RODRIGUEZ who had access to 69 Cutler Street.  During the ensuing conversation,
MELENDEZ and RODRIGUEZ's family member discussed RODRIGUEZ's arrest and the
likelihood that RODRIGUEZ would be held in custody for three months.  MELENDEZ
instructed RODRIGUEZ's family member to "grab everything, a bunch of it is mine."
RODRIGUEZ's family member advised MELENDEZ that he didn't "touch anything," and said,
"we will go together."  MELENDEZ continued, "they know he's locked up and they assume the
worst…I was gonna switch locations."  RODRIGUEZ's family member assured MELENDEZ
that BURGOS a/k/a "Slim" a/k/a "Jordan" "would make a phone call quick – everything is under
control."

73.     Based on this conversation, taken in the context of the investigation to date, I
believe MELENDEZ and RODRIGUEZ's close family member were discussing the possibility

---

[14] RODRIGUEZ was charged in Dudley District Court with disorderly conduct, disturbing the peace,
intimidation, and assault with a dangerous weapon.

of relocating narcotics and other contraband from 69 Cutler Street to another location.  Initially

MELENDEZ instructed RODRIGUEZ's family member to "grab everything," i.e. to remove all

illicit items from 69 Cutler Street.  MELENDEZ's admission that "a bunch of it is mine,"

confirms other information obtained through this investigation suggesting that MELENDEZ,

RODRIGUEZ, and others known to agents work together to obtain and distribute narcotics from

69 Cutler Street.  MELENDEZ's statement they assume the worst" was likely a reference to the

possibility that other individuals with access to 69 Cutler Street may steal narcotics, as they

assume RODRIGUEZ will be unable to monitor their activities due to his incarceration.

## CONCLUSION

74.    Based on the foregoing, I submit that there is probable cause to believe that Junior

MELENDEZ has committed the Subject Offenses, to wit:  (a) conspiracy to interfere with

commerce by robbery, in violation of 18 U.S.C. § 1951, (b) conspiracy to use and carry a firearm

during and in relation to a crime of violence for which a person could be prosecuted in a court of

the United States, in violation of 18 U.S.C. § 924(o), and (c) conspiracy to possess with intent to

distribute and to distribute cocaine and cocaine base, in violation of 21 U.S.C. 846.

WHEREFORE, your affiant respectfully requests that the Court issue a criminal complaint charging Junior MELENDEZ with the Subject Offenses.

ANTHONY J. VENTETUOLO
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn and subscribed to before me this  4th  day of June 2019, at Worcester, Massachusetts.

DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts

29